Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | REBECCA R. PALLMEYER | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 1044 | DATE | May 2, 2001 |
| CASE TITLE | Jimmie Lee Ford Jr., #B-18015 vs. James H. Page, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons set forth in the accompanying Memorandum Opinion and Order, Defendants' motion for summary judgment [#23] is granted. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff pursuant to FED. R. CIV. P. 56. The case is terminated. The parties are to bear their own costs.

(11) ■ [See attached Memorandum Opinion and Order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | MAY 03 2001 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| mjm | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| JIMMIE FORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 00 C 1044 |
| v. | ) | |
| | ) | U.S. District Judge |
| JAMES H. PAGE, et al., | ) | Rebecca R. Pallmeyer |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jimmie Ford, a state prisoner, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims that Defendants, officials at the Stateville Correctional Center, have violated his constitutional rights by acting with deliberate indifference to his health, safety, and medical needs. Specifically, Plaintiff alleges that the water at the Stateville Correctional Center is contaminated with "radium, gross alpha, and lots of rust," that the contaminated water exposes him to risk of cancer and blindness, and that Defendants have failed to make any effort to rectify the problem.

On March 1, 2000, this court dismissed the complaint as against Defendants Illinois Governor George Ryan and the Mayor of Joliet, on grounds that these Defendants were not personally involved in the alleged wrongdoing. In an opinion dated July 7, 2000, the court dismissed Plaintiff's claim that Defendant Dr. Elyea denied him proper care for unspecified ailments unrelated to the water, on the ground that those allegations do not state a claim for relief. The remaining Defendants now move for summary judgment. For the reasons stated in this order, the motion is granted.

The standards that govern this motion are familiar: Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mayoral v. Sheahan*, ___ F.3d ___, No. 00-1034, 2001 WL 290494, at *3 (7th Cir. 2001). In determining whether factual issues exist, the court must draw all reasonable inferences in the light most favorable to the non-moving party. *Mayoral*, 2001 WL 290494, at *3; *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001). If the moving party meets its burden, the responding party must then "come forward with facts 'sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.' " *Celotex*, 477 U.S. at 322; *Langston v. Peters*, 100 F.3d 1235, 1237 (7th Cir. 1996) quoting *Celotex*, 477 U.S. at 322.

## FACTS

Plaintiff is a state prisoner, confined at the Stateville Correctional Center at all times relevant to this action. (Complaint, "Parties" section, at 3.) Defendant James H. Page is Stateville's warden. (*Id.*) At the time Plaintiff filed suit, Defendant Willard Elyea, now the Medical Director for the Illinois Department of Corrections, was the Medical Director for Stateville. (Defendants' Exhibit 2, Affidavit of Willard Elyea ¶ 1.)

Viewed in the light most favorable to Plaintiff, the record presents the following facts: In either September of 1998 or spring of 1999, Plaintiff learned that the Stateville Correctional Center has excessive radium in its water. (*See* Plaintiff's response to Defendants'

2

motion to dismiss (docket #12), at 1 (Plaintiff read about the radium in a newspaper); *but see* Plaintiff's deposition at 22 (he was told about the radium by a fellow inmate)). When Plaintiff researched the situation, a law clerk produced several noncompliance advisories notifying Stateville's then-warden, George DeTella, that the prison had failed to submit water samples to the Illinois Environmental Protection Agency's laboratory on different occasions, and that the prison was required to make public notification of its noncompliance. (Plaintiff's Group Exhibits 1 and 2.)

Upon Plaintiff's arrival at Stateville on May 6, 1998, staff in the prison's health care unit noted that he suffered from moderate asthma. (Elyea affidavit, ¶ 4.) Apart from a self-reported psychiatric history, no other medical complaints were noted. (*Id.; see also* Plaintiff's Medical Records, submitted as Defendants' Group Exhibit 1.) Between November 9, 1998, and March 27, 2000, Plaintiff had approximately twenty-four contacts with prison health care staff. (*Id.* ¶ 5.) The overwhelming majority of the medical requests were for refills of his inhalers or other matters relating to Plaintiff's asthma.[1] (*Id.*) Recently, Plaintiff has also

---

[1] In his response to Defendants' statement of facts, Plaintiff contends that "this is totally untrue, the Health Care staff always contributes any of Plaintiff['s] Medical complaints to asthma and no testing whatsoever was done relating to anything else." However, unsupported statements in a brief are not evidence and cannot be given any weight. *See, e.g., In the Matter of Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985). The court's summary judgment instructions, which were sent to Plaintiff on February 26, 2001, specifically noted that every factual statement must be accompanied by a citation to the record indicating the evidence that supports that factual proposition. Moreover, Plaintiff stated at his deposition that his only significant medical problem is asthma, which has afflicted him since birth. *See* Plaintiff's deposition, at 5. A party may not create issues of credibility by contradicting his own earlier, sworn testimony. *See e.g., Lucien v. Gramley*, 99

(continued...)

begun complaining of knee problems and chronic acne. (*Id.*) None of Plaintiff's medical complaints have been of a serious nature. (*Id.*) Furthermore, none of Plaintiff's medical problems appear to be water-related. (*Id.*) Although Plaintiff once wrote a letter to Elyea complaining that he had been trying to get to the health care unit for several weeks, the letter did not raise any concerns about the water at Stateville. (*Id.* ¶ 7.)² Only since filing this lawsuit has Plaintiff begun complaining of bone aches. (*Id.* ¶ 5.)

As Medical Director at Stateville, Dr. Elyea was not authorized or empowered to direct the prison administration to make any health-related capital improvements to the facility. (*Id.* ¶ 7.) Neither the United States Environmental Protection Agency (hereinafter, "E.P.A.") nor the Illinois Environmental Protection Agency (hereinafater, "Illinois E.P.A.") notified Elyea that there was any significant concern over the safety of the water, nor did either of these agencies direct Elyea to take any corrective measures. (*Id.*) During his tenure as medical director at Stateville, Elyea noted no injury, illness, or complaint from Plaintiff or from any other inmates due to radium or other water-quality issues. (*Id.* ¶ 6.) According to Assistant Warden Vinson, Stateville submits samples of water from three deep ground wells on a quarterly basis pursuant to Illinois E.P.A. requirements. (Defendants' Exhibit 3,

---

¹(...continued)
F.3d 1142 (Table, Text in WESTLAW), 1996 WL 590539, at *4 (7th Cir. 1996); *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168-69 (7th Cir. 1996) citing *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985)).

² The affidavit indicates that the letter in question is attached as Exhibit 2 to the affidavit, but the letter has not, in fact, been submitted for the court's review.

Aff. of Stateville Assistant Warden Vance Vinson, ¶ 2). Samples collected from the wells have concentrations of radium 226 and 228 that exceed the existing maximum allowable concentrations under current standards: Specifically, although the maximum allowable concentration for these combined elements is 5 pico-curies per liter of water, quarterly samples taken at Stateville between 1992 and 2000 indicate levels between 9.5 and 10.6 pico-curies per liter. (Exhibit 1 to Aff. of Roger D. Selburg, Records of radium levels at Joliet and Stateville Correctional Centers.) [3]

As early as 1993, the E.P.A. proposed new combined maximum contaminant levels of 20 pico-curies each for radium 226 and 228 in water. (Vinson Aff. ¶ 3). Under the proposed guidelines, Stateville's water supply would have been well within maximum standards. (*Id.*) The Illinois E.P.A. has never ordered Stateville to undertake corrective action beyond posting of a public notice about the radium content of the water, and has never directed that Stateville furnish inmates or staff with bottled drinking water. (*Id.*)

The prescribed notice has been routinely posted in the inmate law library and the staff dining room, and, as of March 4, 2000, in the inmate dining area. (*Id.* ¶ 4; *see also* Defendants' Group Exhibit 3, Warden's Bulletins concerning radium in the water; Group Exhibit 1 to

---

[3] Neither party has explained the term "pico-curie," but the court notes the following definitions from The American Heritage® Dictionary of the English Language, Third Edition Copyright © 1996, 1992 by Houghton Mifflin Company: "Pico" is a prefix meaning "one-trillionth ($10^{12}$)." "Curie" is a "unit of radioactivity, equal to the amount of a radioactive isotope that decays at the rate of $3.7 \times 10^{10}$ disintegrations per second."

Vinson Aff., Warden's Bulletin #00-05.)[4] The Illinois E.P.A. has accepted the notices as satisfactory. (Vinson Aff. ¶ 5.)

The E.P.A. formalized the combined maximum contaminant levels for radium 226 and 228 on December 7, 2000. (*Id.* ¶ 6.) Although a higher standard had been proposed, the E.P.A. retained the standard of 5 pico-curies per liter of water, to be effective on December 8, 2003. (*Id.*) Now that this 5 pico-curie water standard appears to have been permanently established, Stateville has begun capital developments to bring its water into compliance with that standard before the December 8, 2003 deadline, and has requested that funds be budgeted for the necessary improvements. (*Id.* ¶ 7.)

Stateville's water is sampled and monitored for more than eighty other contaminants. (*Id.* ¶ 8.) Stateville has been in compliance with water standards for all tested contaminants other than radium. (*Id.*; *see also* Defendants' Exhibit 5, February 8, 1999, letter from Illinois E.P.A. Assistant Manager Lou Allyn Byus to inmate J. Des Roches.)

In addition to Assistant Warden Vinson's affidavit, Defendants have offered the affidavit of Roger D. Selburg, Manager of the Division of Public Water Supplies for the Illinois E.P.A. Mr. Selburg, a registered engineer, is familiar with federal water regulations

---

[4] Several inmates have submitted affidavits stating that they have never seen such posted notices. But the notice requirement does not affect whether the inmates have been exposed to undue risk. The court may grant summary judgment if facts are in dispute, so long as those facts are not outcome determinative. *Matter of Wildman*, 859 F.2d 553, 556 (7th Cir. 1988). It should also be noted that non-compliance with the E.P.A. notice requirement would not itself form a basis for a cause of action under 42 U.S.C. § 1983. Violations of state or federal law are not by themselves constitutional violations. Nor does the prison's occasional failure to submit water samples in a timely manner give rise to a constitutional claim.

and findings concerning risk associated with drinking waters. According to Selburg, because the levels of exposure from naturally occurring radium are so much lower than the threshold levels studied by the E.P.A., the risk of bone necrosis and other non-cancer health effects are usually not of concern for radium in drinking water. (Defendants' Exhibit 4, Aff. of Roger D. Selburg, Manager of the Division of Public Water Supplies, Illinois E.P.A., ¶ 5; *see also* 56 F.R. 33072, column 3 [concerning statistical quantitative estimates of the risk of contracting certain diseases from ingesting radium in drinking water].) Correlations between cancer rates and radium in drinking water in three U.S. studies have been "statistically marginal." (*Id.* ¶ 6.) Based on studies, the estimated risk of contracting cancer corresponding to a lifetime intake of water containing 1 pico-curie of radium 226 per liter of water ranges from 4.4 to 8.4 chances in a million (or about 1 chance in 227,000 or 1 chance in 119,000). (*Id.* ¶¶ 8, 9.) The estimated risk of contracting cancer corresponding to a lifetime intake of water containing 1 pico-curie of radium 228 per liter of water ranges from 3.8 chances to 8.8 in a million (or approximately 1 chance in 263,000 or 1 in 114,000). (*Id.*)

The E.P.A rates the mortality risk at one chance in 10,000 for the lifetime drinking of two liters per day of water containing radium 226 in the concentration of 22 pico-curies per liter or radium 228 in the concentration of 26 pico-curies per liter. (*Id.* ¶¶ 10, 11; *see also* 56 F.R. 330573, column 3 and 33074, column 1.) This is more than four times the levels found in the drinking water at the Stateville Correctional Center. (*Id.*; *see also* exhibits attached to Selburg's affidavit.) A "lifetime" estimate is based on seventy years of

consumption. (*Id.* ¶ 15.) Thus, the statistical probability that an inmate will contract cancer from drinking water at the Stateville Correctional Center is extremely remote. (*Id.* ¶14.)

According to the National Inorganics and Radionuclides Survey of 1988, parts of the states of Illinois, Wisconsin, Minnesota and Missouri have high levels of radium in the water. (*Id.* ¶ 12.) Approximately six hundred public water supplies contain radium 226 levels in excess of 5 pico-curies per liter; many are expected to have levels exceeding 20 pico-curies of radium 226 per liter of water. (*Id.*) The same NIRS study indicates that approximately 1.3 million people drink water having radium 228 levels in excess of 5 pico-curies per liter. (*Id.*) Some 164,000 people receive water estimated to have levels exceeding 20 pico-curies of radium 228 per liter and approximately 82,000 persons receive water expected to have levels exceeding 30 pico-curies of radium 228 per liter. (*Id.*) Thus, the levels of radium in Stateville's water system, although higher than both Illinois E.P.A and federal E.P.A. standards, "are neither atypical nor unusual compared to the radium levels present in the water supplies furnished to a large segment of the general population in the Northern Illinois Area." (*Id.* ¶ 16; *see also* Attachment 2 to Selburg's affidavit.)

## DISCUSSION

As discussed in the court's Memorandum Opinion and Order of July 7, 2000, the Eighth Amendment prohibits deliberate indifference to inmates' health, safety, and medical needs. Failure to take reasonable measures in the face of a substantial risk of serious harm violates the Constitution. *Farmer v. Brennan*, 511 U.S. 825, 845 (1994). In order to establish Eighth Amendment liability, a plaintiff must meet two requirements: first, he must show

that the challenged conditions of confinement were objectively so serious as to amount to the denial of a basic human need; second, he must show that the defendant official acted with deliberate indifference. *Id.* at 834. As the Court of Appeals has explained, "the Eighth Amendment does not apply to every deprivation, or even every unnecessary deprivation, suffered by a prisoner, but only to that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind." *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). In this case, Plaintiff has satisfied neither the objective nor the subjective prong.

**No Evidence of a Substantial Risk of Serious Harm**

First, Plaintiff offers no evidence that he faces a substantial risk of serious harm. Some medical studies suggest that the long-term consumption of water containing radium may slightly increase one's odds of developing cancer. The record here shows, however, that the risk is sufficiently minimal that the state and federal environmental protection agencies: (1) debated for almost ten years whether to raise maximum standards significantly; (2) permitted Stateville to take no corrective action while the rates were in flux; and (3) imposed a three-year deadline for bringing public water supplies into compliance. So far as current studies show, exposure to radium at the levels present at Stateville do not pose an excessive risk to Plaintiff's health. As noted, the E.P.A. estimates the mortality risk at one in 10,000 for persons drinking two liters per day of water containing radium four and five times the level of that found in the water at Stateville. The statistical probability of Plaintiff contracting cancer from Stateville's water is simply too remote to implicate constitutional concern, and

9

he has offered no evidence that radium is linked with any health concern other than cancer.

As noted above, there is no evidence that Stateville inmates face any greater risk that the general population in the surrounding geographical area, indeed much of the Midwest. According to the E.P.A., parts of Illinois, Wisconsin, Minnesota and Missouri all have elevated levels of radium in the water. Simply put, the potential problems generated by radium concentrations of this level are risks that society chooses to tolerate. *Cf. Henderson v. Sheahan*, 196 F.3d 839, 847 (7th Cir.), *cert. denied*, ___ U.S. ___, 120 S.Ct. 2691 (2000) (objective inquiry into claim by inmate complaining of exposure to second-hand smoke required more than just a "scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS," it also required that the inmate show "that the risk of which he complains is not one that today's society chooses to tolerate." *See also McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1993) (upholding dismissal of an inmate's claim that his placement near asbestos-covered pipes violated his Eighth Amendment rights where plaintiff failed to prove that he was exposed to unreasonably high levels of asbestos).

In *McNeil*, the Court of Appeals noted, "[I]t is unfortunate, but the fact remains that asbestos abounds in many public buildings. Exposure to moderate levels of asbestos is a common fact of contemporary life and cannot, under contemporary standards, be considered cruel and unusual." 16 F.3d at 125. Likewise, the presence of naturally occurring, trace amounts of radium in the water is a fact of life in much of the Midwest, for prisoners and free citizens alike. Radium in the water may have the slight potential to cause harm after many

years, but this case does not involve the "substantial" risk of serious harm necessary for Eighth Amendment liability.

In his complaint, Plaintiff asserts that besides radium, Stateville's water is also contaminated with gross alpha and rust. Plaintiff has offered no evidence of any kind in support of that allegation, however. To the contrary, the Illinois E.P.A. has confirmed--and Plaintiff concedes--that Stateville meets public safety water standards in all other respects: "Water from Stateville is routinely monitored for approximately eighty other parameters, and the water is in compliance with these standards, including the lead standard." (Defendants' Exhibit 5.) Plaintiff has failed to make a triable showing that the drinking water at Stateville places him at undue risk of harm.

Plaintiff's suggestion that the water has already caused harm is likewise wholly unsupported by the evidence and insufficient to defeat summary judgment. Following his transfer to the Stateville Correctional Center on November 9, 1998, Plaintiff had approximately twenty-four documented contacts with prison health care staff by the time Defendants prepared their motion for summary judgment. The overwhelming majority of his visits were related to pre-existing asthma, although beginning on March 27, 2000, Plaintiff began complaining of acne and long-term knee pain. Plaintiff has produced no medical evidence or any other authority to support his apparent contention that three years of drinking Stateville's water has caused the skin ruptures and knee problems. The literature in the record suggests that radium may possibly cause cancer after long-term consumption, but not the conditions attributed to the water by Plaintiff, and not after such a short time

11

period. The court concludes that Plaintiff's perceived ailments, however serious they may be, are unrelated to the drinking water at Stateville.

**No Evidence that Defendants were Deliberately Indifferent**

Even if Plaintiff had presented evidence that radium in the water exposes him to an excessive risk of harm, the court concludes that Defendants would nevertheless be entitled to summary judgment because there is no evidence that they were deliberately indifferent to any risk of harm to Plaintiff. "The infliction must be deliberate or otherwise reckless in the criminal law sense, which means that the defendant must have committed an act so dangerous that his knowledge of the risk can be inferred or that the defendant actually knew of an impending harm easily preventable." *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996). "Liability under the Eighth Amendment requires punishment, and punishment requires more than negligence, whether ordinary or gross. It requires, at a minimum, that the prison officials have realized there was imminent danger and have refused--consciously refused, knowingly refused--to do anything about it." *Campbell v. Greer*, 831 F.2d 700, 702 (7th Cir. 1987) (citing *Whitley v. Albers*, 475 U.S. 312 (1986)). "If the harm is remote rather than immediate, or the officials don't know about it or can't do anything about it, the subjective component is not established and the suit fails." *Del Raine v. Williford*, 32 F.3d 1024, 1038 (7th Cir. 1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 301 (1991)).

In this case, deliberate indifference cannot be attributed to Defendants since even the state and federal environmental protection agencies--the governmental bureaucracies that oversee such health concerns--required no action. As early as 1993, the E.P.A. proposed new

12

combined maximum contaminant levels of twenty pico-curies each for radium 226 and radium 228 in water. Under those proposed guidelines, Stateville's water would have been well within compliance with government regulations. Accordingly, the Illinois E.PA. did not require Stateville to undertake any corrective action. Nor was the prison required to provide staff or inmates with bottled drinking water.

Under the latest rules, formalized on December 7, 2000, the combined maximum contaminant levels for radium 226 and 228 remain at 5 pico-curies per liter of water. The new rule does not become effective until December 8, 1993--further indication that current radium levels do not constitute an urgent health crisis. Stateville administrators have deferred to the expertise of the state and federal environmental protection agencies, and have complied with all directives from those agencies. As Assistant Warden Vinson explained, Stateville has begun capital developments to bring the radium levels in the water into compliance with the standard before the imposed deadline. Defendants' reliance on guidance from the agencies charged with protecting public health, and their implementation of a plan to minimize radium in the drinking water, defeat any suggestion that correctional officials acted with deliberate indifference to the safety of inmates.

## No Personal Involvement on the Part of Defendant Elyea

In addition to the factors set forth above, Defendant Elyea is entitled to judgment as a matter of law because he lacks personal involvement in water quality issues. To be held liable under the Civil Rights Act, a defendant generally must have direct, personal involvement in the events giving rise to the lawsuit. *Gentry v. Duckworth*, 65 F.3d 555, 561

(7th Cir. 1995). The doctrine of *respondeat superior* (blanket supervisory liability) does not apply to actions filed under 42 U.S.C. § 1983. *See Pacelli v. DeVito*, 972 F.2d 871, 877 (7th Cir. 1992). To be held liable under the Civil Rights Act, a defendant "must know about the [constitutional violation] and facilitate it, approve it, condone it, or turn a blind eye. . . ." *Gentry*, 65 F.3d at 561 (citations omitted).

Dr. Elyea notes that none of Plaintiff's medical ailments are water-related. (Defendants' Exhibit 2, Affidavit of Willard Elyea ¶ 5.) A letter from Plaintiff to Elyea dated April 2, 1999, makes no mention of the water at Stateville. (*Id.* ¶ 6.) While he was Medical Director at Stateville, Elyea was not authorized or empowered to direct the Stateville administration to make any health-related capital improvements to the facility. (*Id.* ¶ 7.) Elyea did not observe a rise in injury, illness or health complaints from Plaintiff or among other inmates due to the water, nor was he notified by state or federal environmental protection agencies of any significant concern over the safety of the water at Stateville. (*Id.*) Because Plaintiff has failed to show that Elyea was personally involved in the alleged circumstances giving rise to the complaint, Elyea is entitled to judgment as a matter of law.

**Qualified Immunity**

Finally, even assuming for purposes of argument that Defendants' conduct did violate Plaintiff's constitutional rights, the court finds that they are entitled to qualified immunity. Under the doctrine of qualified immunity, state officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To evaluate a claim of qualified immunity, the court must engage in a two-step analysis. First, the court determines whether Plaintiff's claim states a violation of his constitutional rights. Then, the court determines whether those rights were clearly established at the time the alleged violation occurred. *See Wilson*, 526 U.S. at 609; *Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1013 (7th Cir. 1997). Only if the rights were clearly established may the official be liable for monetary damages. *See Richardson v. McKnight*, 521 U.S. 399, 403 (1997)

A clearly established right is one where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. "Because there is an almost infinite variety of factual scenarios that may be brought into the courtroom, a plaintiff need not point to cases that are identical to the presently alleged constitutional violation." *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). Nevertheless, an official will not be individually liable unless "the contours of the right . . . have been established so that the unlawfulness of the defendant's conduct would have been apparent in light of existing law." *Id.*, citing *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430 (7th Cir. 1989), *cert. denied*, 498 U.S. 949 (1990).

The court is satisfied that Defendants are entitled to qualified immunity because water standards have been in flux and because the state and federal environmental protection agencies required no corrective action. While inmates are plainly entitled to safe food and water, Defendants properly relied on directives from the E.P.A. water experts, in assessing

15

the risk to inmates posed by the water, and in determining what action needed to be taken. Even if the record supported a finding that Stateville's water had exposed Plaintiff to an intolerable risk of harm (which it does not), the court concludes they may not be held liable individuallyb.

## CONCLUSION

Viewing the evidence in the light most favorable to Plaintiff, no reasonable person could find either that Plaintiff faces an unreasonable risk of harm from drinking Stateville's water or that Defendants have acted with callous indifference to that risk. Defendant Elyea had no personal involvement in creating any risk relating to drinking water. Moreover, all Defendants are entitled to qualified immunity because they have violated no clearly established rights. For all of these reasons, Defendants' motion for summary judgment must be granted.

If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within thirty days of the entry of judgment. FED. R. APP. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C); *Hyche v. Christensen*, 170 F.3d 769, 771 (7th Cir. 1999). If the plaintiff does choose to appeal, he will be liable for the $105 appellate filing fee irrespective of the outcome of the appeal. *Evans v. Illinois Dept. of Corrections*, 150 F.3d 810, 812 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a P.L.R.A. "strike." The plaintiff is warned that if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a

claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury. 28 U.S.C. § 1915(g).

IT IS THEREFORE ORDERED that Defendants' motion for summary judgment (docket #23) is granted. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff pursuant to FED. R. CIV. P. 56. The case is terminated. The parties are to bear their own costs.

ENTER:

Dated: May 1, 2001

REBECCA R. PALLMEYER
United States District Judge